United States v. Sheldon Palmer. Mr. Williams. Judge Jordan, members of the panel, good morning. If it pleases the Court, I'm Douglas Williams. I appear and argue on behalf of Sheldon Palmer, and I thank this Court for the opportunity. What I'd like to do, if I can, is to give the Court a brief idea of where I'm going to try to take the Court in my arguments, because while I have raised various points on appeal, they all tend to blend together, although their points of intersection are different. Clearly, I intend to focus upon the question of the constructive amendment of the indictment, since that was the leading point. But there is also a very meaningful point concerning sufficiency of the evidence in two meaningful particulars, as well as the inappropriate admission into evidence by the district judge of documents that were both hearsay and created in contemplation of litigation, and therefore, at the opposite end of the spectrum from business records. The indictment was constructively amended by the district judge and by government counsel, starting an opening statement when the district judge herself told the jury that the case was about, and the evidence was going to show, conduct as the result of which employees at MoneyGram service centers had been gotten to send false and fraudulent money transfers, resulting in Palmers having picked them up here in the Southern District of Florida. And in order to put that part of it into perspective, what the evidence came closer than anything to showing is that at different parts or points in the country, at different Walmart stores, and perhaps others sending points of transmittal as well, third persons who were never identified in court, and who were not named in the indictment, and who were effectively not known to the government, accomplished the initiation of transfers from outside the Southern District of Florida to the Southern District of Florida, and at the end of that process, they, the sending people, gave notice to second persons who, having received notice of the transfer of funds, then contacted Palmer and asked Palmer, who was nothing but a freelancer and a money runner, according to his own words and according to words that witnesses for the government used, would, on a sporadic, unplanned, casual basis, as it were, go to a place he had been directed, use a number that he had been given, and pick up money and leave. Mr. Williams, wasn't Mr. Palmer charged under an aiding and abetting theory as well, with regards to the wire fraud counts? There is an assertion of aiding and abetting in the indictment, but the proof of his having aided and abetted was tenuous at best, and essentially left to the jury's speculation. Yes, there was reason to believe that third persons had initiated the process, but although the indictment charged Palmer, in its pertinent part, with having transmitted dollar amounts of money outside of the Southern District of Florida to a place in Minnesota, what the government emphasized and what the testimony emphasized and the witnesses described over and over and over again was Palmer's having picked up funds here in the Southern District of Florida at Walmart so-called money centers and then walking out the door. There was never the first shard of evidence that indicated that Palmer had any knowledge at all about any other phase or facet of the transactions, that he knew anything about the transmission of any kind of information out of the Southern District to Minnesota, much less the use of authenticating numbers, and no evidence to show that he knew what the process was or why he knew about it. So that while the indictment says that... Let me interrupt you there. What type of evidence do you say the government would have had to show to demonstrate his knowledge in an appropriate way? Judge, the government showed no knowledge. Right, but what would they have had to show? The government would have been required to present some kind of evidence to the effect that Palmer knew or reasonably was unnoticed that there was this remaining step after he picked up the money where some Walmart employee would then cause an entry to be made into a computer. There was no evidence of that. That there was a link between the Miami-based computer or the Southern District-based computer of the one part and the Minnesota-based computer of the other. There was no evidence of that, none. I mean positively, absolutely none. And then that once the information had been entered into the computer  that it was that process that caused the entire transaction to come to an end. And it was at that moment in time that the wire fraud was completed. So you said the government needed to have some evidence of his knowledge of the use of interstate wires? Yes. I understand the case law to say that it had to be reasonably apparent that interstate wires were being used. But as the indictment is drawn, Palmer would have been required beyond a reasonable doubt to know that interstate wires were used not for the inbound segment of the process whereby people in the northeastern part of the United States or midwestern part of the United States caused the generation of transfer information enabling Palmer to pick up money here. Mr. Williams, I'm going to review what he said. That is, Mr. Palmer and his tape-recorded statement. He gave a tape-recorded statement, right? Yes. And did the government introduce part of that at trial? Yes, ma'am, they did. Did they play the whole statement? I don't recall whether they played the whole statement, but we can take it that they did. All right. And he admitted in there that he picked up the cash on the number of times. Yes, ma'am. All right. He said he personally never heard the fraudulent calls, but he did hear the people he worked for discussing how the calls were made. So he knew they were making calls from somewhere else out of state to here. Yes, ma'am. To South Florida. Yes, ma'am. He said that he was aware that people he worked for had obtained the money by, quote, getting on the phone and tricking somebody. Getting on the phone and tricking somebody. Yes, ma'am. He said that. He also said that he went to the Walmart stores and used the fictitious names and the fictitious information and fictitious driver's license, fictitious IDs, to help the Walmart store fill out the paperwork. Correct? On occasion, yes, ma'am. Just going to his intent here. Yes, ma'am. So he was aware the scheme was fraudulent, what was going on. Is that not correct by his own statement? We can take it, Judge Hull, that he had awareness of the fraudulent nature of the transaction. Okay. So I understand what you're saying. He just didn't know that there's a wire he was using, that it's going back. I'm not sure he needs to know for sure. I know you argued that in your brief, that he had to know of the last step before the cash was given to him. That's what your argument is, right? No, ma'am. All right. Clarify it for me. Yes, ma'am. Let's take it as a given that he knew that there was fraud involved to some extent. Let's take it that he admitted that in his tape recording statement. Very well. In the process of generating the transfers from other parts of the United States to the Southern District of Florida. I give that to the court. It's undeniable. What is missing is any evidence whatsoever that Palmer knew anything at all about any step, any phase, any process, by virtue of which once he picked up the money and walked out of the store and everything else that happened. You mean that Wal-Mart then did something else? Yes, ma'am. All right. Here's another thing he said. He said before the Wal-Mart stores required the ID, the information that he needed for the cash pickups was text to his cell phone, including a name, the reference number, the test question, and the answer to the test question because that was part of the security protection. They had a question and you had to know what your mother's maiden name. I don't know what the questions were. True. He admitted all that had been text to his cell phone. Or perhaps even by voice communication, one or the other, to his cell phone. But all of that . . . And he needed that to complete the transaction, correct? He needed that, Judge Hull, to walk into the store and get money in his hand and walk out. But he wasn't charged with that. The indictment charged him with the final phase that occurred long after he was gone, with regard to which there was absolutely no evidence that he had any information at all. And it is exactly on point with this court's opinion from earlier this year in United States v. Carroll, dealing with peer-to-peer networks where a person was found to have had child pornography on his computer that the government accused him of distributing, but failed to show that he had any knowledge at all that anybody else had any access to his computer. And therefore could help themselves to the content of his hard drive. There is essentially no difference. So, already over time . . . That's okay. You think, Mr. Williams, that the wires that were charged substantively in the indictment were the wire communications that occurred after he picked up the cash and not the ones that preceded the pickup of the cash? Judge Jordan, the Walmart fraud investigator himself said that, albeit in one word, in one line, to the answer to one question. When he was asked by me, when did Palmer transmit money out of the Southern District of Florida? And the government, taking him on redirect, asked, was it causing wires to be used in the fraud that the indictment charged? Or was it sending money, as counsel said? And the Walmart employee said, wires. Referring to the after-the-fact, essentially mechanistic process of local Walmart persons putting information into a computer here after Palmer was out of the store with money in his hand in the absence of any evidence at all in this record that he knew that anything else was left in the process. If that's the chronology and the wires that are charged in the indictment are the post-pickup transmissions? Absolutely, every one of them. I'm assuming that for purposes of this question. What does a defendant charged with wire fraud have to know about the nature of the wire transmission to be liable? In every wire fraud case that this court has decided, there has to be knowledge of an intentional participation in a scheme, usually a sophisticated scheme, resulting in the perpetration of a fraud. In this case, Palmer... Well, that's not an issue here. There was undoubtedly sufficient evidence of fraud as a general matter, right? Judge Jordan, inbound fraud, picking up the money. There's no such thing as inbound and outbound fraud. It's a fraudulent scheme, and it has an inbound component and it has an outbound component. You're saying you segment those two things for legal purposes? I do, Your Honor, because the indictment charged Palmer with exactly that. The indictment charged Palmer with transmission in dollar figures out of the Southern District of Florida to someplace in Minnesota. Okay, then my question, which goes back to one of the first things we discussed, if the wire that's charged is the wire sent to Minnesota from a Walmart store after he picks up the cash, how can he not aid and abet the transmission of that wire if the pickup is necessary for the transmission of that wire? He can only aid and abet it if he has some element of knowledge that it's taking place and takes some affirmative step toward causing it to happen. Well, he did. He picked up the cash. You're saying what's missing is the knowledge element. Knowledge? If someone has a phone or some other device that's going off. Oh, okay. Never mind. Knowledge plus the taking of some affirmative step in order to assist the perpetration or the culmination of the events described in the indictment. So it's not just knowledge, which he didn't have. And I keep on coming back to the point that there was no evidence before this jury at all, not the first bit, that Palmer had any knowledge of any southern district of Florida to Minnesota ligament, much less that he took any step toward the end of accomplishing that. But to the contrary... Well, it couldn't have been accomplished unless he gave the matching data information. I don't know whether that's enough. That step of the transmittal back would have never happened. He caused it to happen because he gave the correct matching information. Judge Hull? I'm not saying that's enough. But the transmittal back, if he hadn't showed up with the right answer to the test question, the right ID, and the right reference number or whatever it was he had to have, then Walmart wouldn't have caused that transaction, a wire transfer wouldn't have occurred. Is that correct? It would have stopped if he didn't show up and give them the right information. On an after-the-fact basis, we now know that because of a process... No, wait a minute. I'm just trying to say that if he hadn't showed up with the right information that matched what was in the terminal, Walmart terminal, then Walmart subsequently would not have sent it. Is that right? Only if he knew that there was a terminal, and only if he knew... I'm not going to his knowledge yet about the wire. I'm just saying the wire would not... But it wouldn't have happened if he hadn't showed up with the correct information. It wouldn't have happened if that hadn't been the system that Walmart had designed about which Walmart had exclusive knowledge to the exclusion of all other third persons on this globe. That's the only way in which it could have happened. Palmer can't be held responsible for something about which he had no knowledge and in which he did not knowingly and willingly participate. All right, Mr. Williams. We've taken you way over your time, but you've saved all of your time for rebuttal. Thank you. Thank you. Mr. DeRosa. Philip DeRosa on behalf of the United States. I'd like to introduce with me a counsel table, AUSA Lisa Miller. She was one of the trial attorneys during the trial of this case. I racked my brain trying to figure out why Mr. Williams believes that the government charged Palmer with transmitting money to Minnesota when it's so obvious from reading the indictment that he's charged with transmitting or causing to be transmitted images and signals and signs and writings. The only thing that makes sense is that he's, Mr. Williams is hung up on the language in each individual count of the indictment, and each individual count of the indictment charges, and I'll give you the, start with count one, the example that it charges Palmer with the transmission from the Southern District of Florida to MoneyGram in Minnesota for $739.39 money transfer with reference number 89337414. And actually, I agree with you that that seemed to be the argument that was primary in the brief. What it seems that we're hearing today is that the government was responsible for showing the defendant's knowledge that a particular wire signal will be sent after he picked up the money. What's your response to that argument? You don't want to talk about the constructive amendment. That's fine. Hassan says that all we have to prove is that there was intentional participation in a scheme to defraud and the use of the interstate wires in furtherance of the scheme. Use of the wires need only be reasonably foreseeable to the defendant. I'm not aware of any case where it says that we have to prove that he had knowledge that the wires were interstate. That's just the hook for federal jurisdiction. We only have to prove that he used the wires. And we can prove that either by actual knowledge or by proving that he reasonably intended to use the wires. In other words, the wires have to be incident to a step in the fraud scheme. We proved that. As to his knowledge that wires were used in furtherance of the scheme, the evidence established from what Judge Hull has said, he confessed that his scheme involved people getting on the phone and tricking people. Getting on the phone. The phone is the wires. No, that's not the wire charged in the indictment. You didn't charge him with conspiracy. I'm not saying you, Mr. DeRosa. The government didn't charge him with conspiracy. The government charged him with substantive counts of wire fraud. And I agree with you that they don't charge him with the money itself. It's a transmission to accomplish it. But the phone calls are not charged, right? Right. It's the transmission from Walmart to Minnesota to accomplish the final link of the money transfer. I don't know why the government has... I don't know why the proof has to be segmented into inbound and outbound. It's all in the fraud scheme. I'm not saying it has to, and I don't think it does. I'm just... The way I read the charges in the indictment were they didn't charge the phone calls. They could have charged the phone calls, but they don't charge the phone calls. That's why I started my argument with very specific emphasis on the word for. The government was very careful with its language. In all 13 counts of the indictment, it says that he's responsible for the transmission in regard to each money transfer. It doesn't say that he transmitted $739.39 of money. It says for, and that in context means with respect to or concerning. It seems to me that the government's language in that charge covers both the inbound and outbound. In other words, he's responsible not only for causing the wire transfer. He's aiding and abetting the transmitting of the wires to send the money. And as a principle, he's responsible for causing the transmission on the wires to pick up the money. Now, there are 41 videotapes in this case that show him standing in front of an agent in a store typing things into a computer. As he's giving that agent all of the information that the agent needs to give him his illicit money, the agent is typing it in. You would have to be a Luddite not to know that the wires are being used. Computers are no different from phones. They're part of an interconnected worldwide net  And he's standing there causing an agent 41 different times to enter information into a computer. And that information is transmitted over the wires to the mainframes in Minnesota. He doesn't have to know that those computers are in Minnesota. He knows that wires are being used, but I'll tell you what. He knows that this scheme has an interstate commerce element because he was caught in April of 2015. His name first came up when he went into a Walmart with a friend of his, and they tried to send $5,000 of money in a money order to Oklahoma. His friend didn't have ID, so Palmer says, wait here, I'll go out to my car and get ID. He came back into the store, presented his ID, then tried to give a bribe to the agent to let him use his ID. That's how his name came up. That's when we first identified Sheldon Palmer. He knew that that money order was going to Oklahoma. That's proof that he knew the interstate element. But again, like I say, I'm not aware of any case law that says that we have to prove that he knew that it was going to Minnesota or across state lines. The only thing that Hassan compels us to prove is that he knew that the use of the wires were involved, not the use of interstate wires. I agree. The cell phone evidence is not about so much to prove the interstate commerce element here. It's just knowing that there are people out there that are using the wires, so it's a reasonable inference that when the terminal and they're entering the data, that he comes to that terminal with fraudulent intent. He knows it's all fraud, okay? And I'm looking at your indictment. It says use of wires, okay? So you defined it as for purposes of executing an infurtherance of the scheme. He made false pretenses, which caused to be transmitted in interstate commerce. So I don't know that he has to have knowledge of the cause to be transmitted. Maybe he does. I don't know. But it seems to me you could also argue even if there was a constructive amendment, he was fully advised of what he was charged with. Yes, ma'am. And he certainly aided and abetted.  You did charge a violation of 1343 and 2. Yes, ma'am. So you have an aid and abetting charge. Again, I don't think... he would have even if there's some type of... Did you argue that in your brief, there's no prejudice at all, that he was fully advised of the charges, or you didn't argue that? I think I made that argument, Your Honor. Okay. My featured argument was that there was no constructive amendment whatsoever. So I didn't have an alternative argument saying even if there was, there was no prejudice. I think I've exhausted the Court's questions with respect to constructive amendment and sufficiency. Those were the only two issues that were raised here in oral argument. I don't expect there to be any argument about business records. I can't argue that. But if the Court has any questions about the business record aspect of the brief, then I'll be more than happy to answer them. I do have a question, as long as we're here. Do you know how Exhibit 26 was created? Yes, ma'am. And I have to say before I answer your question that my argument in the government's brief is flawed. It doesn't really help you decide what you need to help because I didn't understand Mr. Williams' argument with respect to Government Exhibit 26. And I didn't focus clearly on his concerns. Government 26 is an Excel spreadsheet. It's a computer printout of information pulled from business record information that's stored in MoneyGram International Computers in Minnesota. The problem that I missed in my brief was that that Excel spreadsheet, Government Exhibit 26, was introduced as a business record under 803-6. It probably should have been introduced as a summary chart under Federal Rule of Evidence 1006, the same way Government Exhibit 30 was. Government Exhibit 30 is like a summary of Government Exhibit 26. And Government 26, you know, Mr. Williams is right. They're both summary charts. That being said, both Government Exhibit 26 and Government Exhibit 30 were admissible because the form in which electronic business data is presented, whether it's a computer printout or a summary chart, that's not the deciding factor. Every item in Government 26 reflects a bare fact that was pulled from business records. All of those business records were not only provided to Mr. Williams before trial, but they were introduced as evidence at trial. So, you know, if there's any inconsistencies between the Excel spreadsheet and the summary chart and the business records, the jury can cross-check them. This was the real basis for the judges when the judge told Mr. Williams, you need to check out ECIOR, the DC case, because it says that just because electronic business data is presented in a spreadsheet or computer printout, that doesn't mean that it alters the underlying validity of the business records. And, you know, he's cited a couple cases that says computer printouts are not admissible. That may be true, but in those cases, the government didn't put in the underlying records or didn't make them available to the defendant or called a witness who wasn't able to authenticate them. We don't have that problem here. Every business record that's relevant to the 41 money pickups from Sheldon Palmer was introduced into evidence. So... To make sure I understand, it sounds like you're saying there's a large database that has all of the information  Yes, ma'am. And that Exhibit 26 is a subset of those records with no changes made to those records? Correct. Yes, ma'am. And even at that, most of the information in Government 26 is not even relevant. You've got things like the zip code, which to me is not relevant for the charged money pickups, and that's why the government tried to winnow Government 26 down by introducing Government 30. Like I said, it was a summary of a summary. But to the extent that I called Government Exhibit 26 a business record, I think that's a mistake. I was wrong. I think it's a summary chart. It probably should have been introduced as a summary chart, but to me it's a distinction without a difference because all of the business records were there. Who prepared that? Was it the employee or unemployee from MoneyGram who compiled that Excel spreadsheet? Yes, sir. It was William Hart. He's the guy at MoneyGram who's responsible for responding to subpoenas from the government. So the government issued him a subpoena and said, we want all of the business record, all of the information you have about these money transactions. So he pulls it out of the computer, puts it on a spreadsheet, an Excel spreadsheet. But again, all of the facts on that Excel spreadsheet are in the underlying business records which were introduced at trial. The court has no other questions. Thank you for your time. Thank you, Mr. DeRosa. May it please the court. We have now heard the government admit that the records of both Governments 26 and 30 were in fact prepared for use at trial, which in and of itself essentially takes them out of the class or category or definition of business records. Judge Hill asked how the information in Governments 26, which was the overarching chart, came into existence and how it was put together. And the same Mr. Hart, to whom the attorney for the government made reference in his argument, said that the information in that chart was pulled by his team. The government says the underlying information, the business records themselves are in evidence too. Is that correct? I know they took it from these underlying records and made this Excel spreadsheet, but the government stresses the underlying business records were put into evidence. It's a simple question. Is that true? No, ma'am. What the government said and what the testimony at trial was was that Mr. Hart... I'm not talking about a testimony. I'm talking about were there other underlying business records behind Exhibit 26. We don't know that. What we do know... We do know whether they're in evidence at trial or they're not in evidence. There are records in evidence at trial, Judge Hull. We do not know whether they are all of the records because... But there are some business records that reflect the original data entries that are now put on the Excel spreadsheet. Is that correct? There are some business records, Judge Hull, that were not susceptible of cross-examination  as to what to include and what not to include in the same way that Government's 30, which was the summary chart, also put together... We know about 30. We're asking about... Because 26, if it's in, you can probably have 30. We're looking at 26 here. And I think you've answered my question. I just looked at the record here, and it seems like there are video clips of every time your client picked up money at the Walmart store. Is that correct? Did they come into evidence? Video clips came into evidence. And video shots of every time he did the 41 pickups. Are they in evidence? There are video clips in evidence. Whether they are Sheldon Palmer is fairly debatable. I understand. Somebody identified him and said, that's him, I realize that, but that was for the jury to determine. I was just looking at the pictures of the video clips. He's in front of four or five computers, and did they enter data into the computers while he's standing right there? In some cases, yes, ma'am. Okay, and that's what the government contended. And is it true that they put in evidence that he legitimately used MoneyGram and Walmart to send that $5,000 bail to Oklahoma? Did they put that in evidence, too? I did. Oh, you put that in. I put into evidence the sending of the bail money to Oklahoma. To show that he thought this could be Yes, ma'am. And he sent it from South Florida to Oklahoma. Yes, ma'am. Why wouldn't there be sufficient circumstantial evidence, given all the computers there, they're entering this, given his prior transaction when he's used it, to know the wires are being used in interstate commerce at these computer terminals? Because he didn't know that there was a ligament at all between his walking into a store and picking up money and walking out with cash in his pocket and the after-the-fact, internally-generated transmission of information about which he had no knowledge. The difference is this. Is there enough circumstantial evidence for him to know that they're sending the name, the reference number, the test question answer, all of that data to somebody? No, ma'am. There is no evidence. There's no circumstantial evidence. He would reasonably foresee that those computer terminals are being used to contact somebody else. No, ma'am. United States v. Hassan doesn't help the government. There is no evidence at all in the record that could give rise even to the inference that it was reasonable for him to foresee that that was happening. And with regard to the 41 other episodes or transactions that the government was allowed to put into evidence, those were so clearly prejudicial and unnecessary. They weren't 404B evidence. They weren't Intrinsic Act evidence. They were not inextricably intertwined. But more than anything else, they should have been excluded by Rule 403 because, as we said in the brief, the indicted counts and the evidence for the indicted counts was more than enough to show that Palmer knew he was coming into the store to pick up money. And that's all they showed, that he was coming into the store to pick up money. The remaining 41 transactions was absolutely superfluous overkill that had only one purpose, and that was for the purpose of prejudicing the jury and showing bad conduct, bad acts, and bad character on Palmer's part. And that's why, when we finally argued the case to the jury, after stressing the way in which the indictment had been constructively amended, after objecting to the introduction of the so-called business records, which were not, after underscoring by objection the fact that... Did he receive 54 months on the aggravated identity theft counts? Was he convicted on those two? He was. And does he have concurrent sentences? There are three or four aggravated identity theft counts. No, ma'am. He got consecutive sentences to the wire fraud sentence. On the aggravated identity theft. But the identity theft sentences were concurrent one to the other. Okay. Got it. Thank you. And so... He's answered my question. You need to... I close with... Wrap up. I'm sorry, sir? No, I just suggested you need to wrap up. I close with a comment that I did when I was arguing in front of the jury. Given all of the errors that permeated the trial from the introduction of the extrinsic acts or the intrinsic acts, which were wholly unnecessary, and the use of hearsay, and the tainted nature of what the government portrayed as business records, we come back to Jackson v. Virginia, which is one of my favorite cases of all times published by the Supreme Court, in which they said, under our system of criminal justice, even a burglar has the right to complain that he has been unconstitutionally prosecuted and convicted as a thief. And that's exactly what happened here. All right. Thank you very much, Mr. Williams. Thank you very much, Mr. Rosa. Mr. Williams, we know that you were court appointed for Mr. Palmer, and we really do appreciate your service to him and to the court. Thank you. It's always a pleasure. Thank you, Your Honor.